# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-0947V**

| | |
|---|---|
| ANTONIO J. SMITH,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: August 3, 2026 |

*Jubaile Abila, Taylor Law Group Limited, Glendale, WI, for Petitioner.*

*Elizabeth Andary, U.S. Department of Justice, Washington, DC, for Respondent.*

**DECISION AWARDING DAMAGES**[1]

On February 18, 2021, Antonio J. Smith filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] ("Vaccine Act"). Petitioner alleged that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on November 5, 2019. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

**For the following reasons, I find that Petitioner is entitled to a damages award of $100,000.00 for pain and suffering.**

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I. Procedural History

The case was assigned to the SPU in September 2021. ECF No. 11. On January 20, 2023, Respondent filed a Rule 4(c) Report recommending denial of entitlement to compensation for a Table SIRVA. ECF No. 29 at 7-8. The parties thereafter submitted briefing in anticipation of my ruling on the record. On May 28, 2024, I issued a ruling on entitlement in Petitioner's favor, and encouraged the parties to reach a reasonable and prompt compromise on an appropriate pain and suffering award. ECF No. 37 at 10.

In October 2024, the parties represented that they had reached an impasse in damages negotiations. ECF No. 46. This matter was then set on a briefing schedule. On November 27, 2024, Petitioner filed a brief in support of damages.[3] ECF Nos. 48, 49 ("Pet'r Br."). Respondent filed a response brief on January 13, 2025. ECF No. 50 ("Resp't Br."). On January 27, 2025, Petitioner filed a reply. ECF No. 51 ("Pet'r Reply"). This matter is thus ripe for resolution.

## I. Factual Findings

In this section, I draw upon the recitation of the facts contained in my May 28, 2024 Ruling on Entitlement. However, the Ruling did not necessarily focus on evidence that would be relevant to determining a damages award. Further, after May 28, 2024, Petitioner filed additional treatment records. To give these documents context and to capture the full scope of Petitioner's injury and treatment from a damages perspective, I discuss Petitioner's entire course of treatment from vaccination onwards.

Petitioner was 38 years old at the time of vaccination. Ex. 3 at 258-59. He was (and still is) incarcerated by the State of Wisconsin. A nursing note from April 2019 suggested that Petitioner suffered from neck pain, but this condition was not confirmed by any physical examination or diagnosis involving the neck. Ex. 4 at 18-19. Petitioner had a history of low back pain extending down his left leg, attributed to sciatica, and a previous motor vehicle accident. *See id.* at 17, 19, 22, 24, 34, 64, 65, 122, 125, 262.

Petitioner received the flu vaccine in his left arm on November 5, 2019. Ex. 3 at 53, 258-59. Later that same day, he submitted two separate health service request ("HSR") forms complaining of "excruciating" pain at the vaccination site. *Id.* at 14-15. Petitioner was seen by a nurse the next day and told to use warm compresses and

[3] Petitioner made this filing in the form of a separate motion for ruling on the record (ECF No. 49) and memorandum (ECF No. 49).

ibuprofen.[4] Petitioner submitted three more HSR forms over the next week complaining that his left arm had "locked up" from the pain. *Id.* at 311-315.

Petitioner saw a nurse again on November 12, 2019. *Id.* at 32. The nurse described that Petitioner held his arm "in a dependent position with his hand clenched like a fist." *Id.* Petitioner reported that he had "absolutely no movement" in his left shoulder and was unable to open his fingers. *Id.* The nurse attempted to open Petitioner's fingers and test his passive range of motion ("ROM"), but he resisted this examination. *Id.* Petitioner rated his pain as 10/10. *Id.*

On November 13, 2019, Petitioner saw Dr. Eileen Gavin. *Id.* at 18. Dr. Gavin similarly documented that Petitioner claimed to be unable to move his left arm at all due to pain and resisted any attempt to move it. *Id.* Dr. Gavin discussed with Petitioner "at great lengths the importance of [ROM] exercises for the shoulder before it becomes frozen." *Id.* Dr. Gavin prescribed Petitioner diclofenac and lidocaine creams and instructed him to continue taking Tylenol and naproxen. *Id.* Dr. Gavin also referred Petitioner to physical therapy ("PT"). Petitioner submitted additional HSR forms over the next two weeks continuing to complain of excruciating pain and demanding a cortisone steroid injection immediately. *See id.* at 279, 281, 285, 286.

Petitioner had an initial PT evaluation on December 16, 2019. Petitioner reported that he could move his left arm "a little bit more now," but was still having a lot of pain and stiffness. *Id.* at 66. Petitioner participated in two more PT sessions on December 27, 2019 and January 6, 2020. *Id.* at 62-71. Petitioner was discharged with a home exercise plan ("HEP") at the January 6, 2020 appointment, and though he was still having pain with movement and decreased ROM, he expressed willingness to "continue exercises on his own for awhile and see if things start to get better after a couple of weeks." *Id.* at 62.

Petitioner submitted further HSR forms for his left shoulder pain, and then saw a nurse on February 19, 2020. *Id.* at 23. The nurse referred Petitioner to a physician. On March 4, 2020, Dr. Tricia Lorenz assessed Petitioner with tendinitis and impingement syndrome. *Id.* at 19-20. As previously, Petitioner refused to allow the Dr. Lorenz to move his left arm, and "would guard and resist any small movement." *Id.* at 19. Petitioner also had not been performing his HEP due to pain. *Id.* Dr. Lorenz encouraged Petitioner to move his shoulder and referred him back to PT. *Id.*

---

[4] Due to the institutional environment, Petitioner had to see a member of the medical staff to receive even non-prescription medication. Petitioner also often complained that his medication was not being distributed properly by the guards.

On June 25, 2020, Petitioner saw orthopedist Dr. Michael Gross, where he complained of "100/10" pain.[5] *Id.* at 34-35. Petitioner had not yet seen the physical therapist again due to the COVID-19 Pandemic. *Id.* Dr. Gross repeated the assessment of tendinitis and impingement syndrome, and obtained an x-ray of the shoulder with unremarkable findings. *Id.* at 34-35, 76.

On July 30, 2020, Petitioner resumed PT for his left shoulder. Ex. 5 at 104. On exam, the left shoulder was painful and ROM was "grossly impaired." *Id.* at 105. The physical therapist assessed adhesive capsulitis in the "freezing stage," which would likely be followed by "frozen" and "thawing" stages. *Id.*

On September 25, 2020, Petitioner was transported off-site for evaluation with Dr. Edward Riley, an orthopedic surgeon at the Gunderson Health System. *Id.* at 114. Dr. Riley recorded Petitioner's history of left arm pain following the flu shot, as well as a current "painful knot in the left back of his neck." *Id.* at 115. On exam, Dr. Riley noted that Petitioner's "[b]iceps, triceps, wrist extension and flexion, finger extension and flexion are all slightly weak on left." *Id.* Dr. Riley also specifically noted that "[t]his does not really appear to be due to poor effort." *Id.* Dr. Riley ordered a left shoulder and cervical spine MRI.[6] *Id.*

During this time period. Petitioner attended PT sessions on a monthly basis, except for January 2021. *Id.* at 93, 95, 98, 100, 102, 104. At his February 25, 2021 session, the physical therapist stated that Petitioner did not have adhesive capsulitis, but that "fear avoidance/pain limits his ability to range his shoulder." *Id.* at 92. The physical therapist instead believed that referred pain from Petitioner's cervical spine might be the cause of his pain. *Id.* The physical therapist added cervical spine strength exercises to Petitioner's treatment. *Id.*

Petitioner was discharged from PT on April 8, 2021 after eight sessions total.[7] *Id.* at 90. Petitioner's left shoulder had full strength, full active ROM, and somewhat limited, but "functional," passive external and internal rotation. *Id.* Petitioner was found to have met his goals and was provided with a HEP. *Id.*

---

[5] In the interim between his March 4, 2020, and June 25, 2020 appointments, Petitioner submitted several HSR forms regarding his left shoulder pain and other issues. *See* Ex. 3 at 296-299, 306.

[6] The January 27, 2021 MRI of Petitioner's left shoulder revealed supraspinatus tendinosis and mild acromioclavicular osteoarthritis. Ex. 5 at 110. That same day, an MRI of his cervical spine visualized degenerative changes and moderate left-sided foraminal narrowing at C5-6 and C6-7. *Id.* at 109.

[7] Petitioner filed suit on February 18, 2021.

Over the next five months, Petitioner had numerous contacts with the prison medical staff, including nurse and physician visits, mostly related to lower back pain. *See id.* at 19, 20, 23, 27, 39, 33, 35, 38, 41, 444, 447, 450, 461, 463, 465, 467. Petitioner did not discuss his left shoulder during this treatment.

On September 18, 2021, Petitioner submitted an HSR form complaining that his mattress was full of mildew and that he was sleeping on the concrete slab as a result. *Id.* at 441. Petitioner stated that his “lower back and legs and shoulders are aching very bad.” *Id.* Petitioner made a similar report of back/shoulder pain, implied to be related to not using his mattress, to a nurse on September 20, 2021. *Id.* at 23.

However, on September 21, 2021, when he saw a doctor, Petitioner apparently gave a somewhat different complaint that his mattress situation was exacerbating his lower back pain, and that he had “ongoing left shoulder pain.” Ex. 6 at 20. The doctor found that Petitioner had normal passive ROM in his left shoulder, but was “slightly tender with active [ROM] or palpation of the deltoid muscle . . . .” *Id.* at 21. Petitioner was referred to PT for his shoulder. *Id.*

Petitioner attended PT addressing both his left shoulder and lower back on October 18, November 16, and December 18, 2021.[8] *Id.* at 78-92. Petitioner was discharged at this December 2021 appointment due to reaching a plateau. *Id.* at 80. The physical therapist noted that Petitioner’s subjective ratings of pain were “still severe and unchanged,” although all mobility was normal. *Id.* at 81.

In January 2022, the correctional facility nurses and physical therapist asked Dr. Justin Ribault to assist with Petitioner’s ongoing complaints. *Id.* at 51-54. On February 1, 2022, Dr. Ribault’s examination of Petitioner found “limited left neck rotation, limited left shoulder abduction, poor internal rotation; left trap palpation produces pain.” *Id.* at 17. Dr. Ribault also wrote:

> [Petitioner] has had a stable left shoulder decreased range of motion along with localized pain since at least ’18. A 1/2021 MRI showed a supraspinatus tendinosis which would not correlate with his inability to internally rotate his arm. Also per that MRI, he has evidence of a left cervical radiculopathy, but his pain complaint seems to be focused at the rotator cuff and did not correlate with a C5/C6 radiculopathic pattern. His left trapezius is strained which makes sense as it involves the neck and shoulder.

---

[8] At the same time, Petitioner had doctor visits regarding his low back and bilateral leg pain, without any discussion of his left shoulder. *See id.* at 18-21, 48-50.

*Id.* Further, Dr. Ribault noted that Petitioner's shoulder complaint did not "totally matc[h] noted MRI abnormalities." Ex. 5 at 18.

Petitioner had several appointments with the correctional facility nurses and doctors in March-July 2022. In general, Petitioner continued to complain of low back and left shoulder pain.[9] *See* Ex. 7 at 11-13, 23-26. Petitioner was prescribed duloxetine (Cymbalta) and indomethacin, although he complained of abdominal pain from these medications. *See id.* at 26. Petitioner also participated in three more PT sessions addressing his left shoulder and lower back on April 21, June 16, and July 14, 2022. *Id.* at 43-49; Ex. 8 at 44-47.

In the last week of June 2022, Petitioner submitted three HSR forms requesting pain management, surgery, and indicating a desire to go ahead with shoulder surgery.[10] *See* Ex. 7 at 86, 88, 90. Petitioner then saw Dr. Godiwalla on July 1, 2022. Ex. 8 at 23-30, 48. Dr. Godiwalla determined that Petitioner's left shoulder and low back pain warranted another off-site consultation with the orthopedist. *Id.* at 23-30.

After several postponements, Petitioner had an appointment with Dr. Riley on November 4, 2022.[11] Ex. 8 at 49. Based on Petitioner's MRIs, Dr. Riley assessed "[c]ervical spondylosis with multilevel nerve root impingement and exam c/w left UE weakness. Chronic left shoulder pain and limited motion. Could be sequela of frozen shoulder." *Id.* Dr. Riley determined that Petitioner's "neck situation" and left upper extremity weakness should be clarified and evaluated before proceeding with any treatment for his left shoulder. *Id.* To this end, Dr. Riley recommended referral to a neck specialist or an electromyogram ("EMG"). Dr. Riley also suggested that "[t]reatment of the shoulder itself could be trial cortisone injection or arthroscopic eval[uation]." *Id.*

On November 9, 2022, Petitioner complained again of left shoulder pain. *Id.* at 27. The nurse advised that he was being scheduled for an off-site pain management consultation. *Id.* At this pain management appointment, on November 15, 2022, Petitioner was recommended for a steroid injection in his lower back.[12] Ex. 10 at 72. The pain

---

[9] Respondent highlights four instances in which Petitioner was described by his treaters as having been playing basketball. Resp't Br. at 7 (citing Ex. 7 at 20, 23, 26, 46). Petitioner was also described by the physical therapist as losing weight from exercising during this time period. *See* Ex. 7 at 46.

[10] It is unclear who initially suggested shoulder surgery to Petitioner.

[11] In the interim, Petitioner continued to submit HSR forms complaining of severe pain in his left shoulder and lower back. Ex. 8 at 82, 83, 88, 89. Petitioner also saw a nurse on October 11, 2022. *Id.* at 30. Petitioner rated his pain as 10/10, but also stated that Tylenol and capsaicin cream helped his pain. *Id.*

[12] Petitioner was scheduled to receive a steroid injection in February 2023, but stopped the procedure

management specialist also agreed with Dr. Riley that an EMG of the left arm should be considered. *Id.*

On November 16, 2022, Petitioner had a nurse visit regarding his left shoulder pain, which he rated as 10/10. *Id.* at 34. The nurse encouraged Petitioner to take his indomethacin and other prescribed medications. *Id.* Additionally, the nurse listed several ways that Petitioner appeared to actually be able to move his arm without difficulty. *Id*.

On November 23, 2022, Petitioner was again discharged from PT. *Id.* at 63. The physical therapist noted that Petitioner's progress had plateaued and that the orthopedist had recommended an EMG to rule out the neck as a source of shoulder pain. *Id.*

After a pain management appointment on February 28, 2023 regarding his back pain, Petitioner's treaters discussed whether more PT for both his lower back and left shoulder would be helpful. *See id.* at 37-38. The physical therapist was not sure if Petitioner would benefit from more PT, given that he had already completed three rounds and still had subjective reports of pain. *Id.* at 38.

On May 1, 2023, Petitioner was seen by Dr. Ribault for neck, back, and left shoulder pain. *Id.* at 40. Dr. Ribault discussed the need for "active mobility of joints" and recommended Cymbalta, which Petitioner had rejected earlier. *Id.* In communications with other medical staff, Dr. Ribault explained that Petitioner had only tried Cymbalta for a short period and this was not sufficient to know if it had caused the claimed side effects.[13] *Id.* at 36. Dr. Ribault also ordered further PT for Petitioner's left shoulder. *Id.* at 41.

Petitioner had a PT evaluation on June 16, 2023, for left neck and shoulder pain. *Id.* at 57. Petitioner rated his left shoulder pain as 9/10 at rest and had some restricted ROM consistent with capsular thickening. *Id.* at 57-58. Petitioner had tried some of his previous PT HEP exercises, but had been mostly sedentary. *Id.* at 57. Petitioner also stated that he had a "difficult time defending himself in recent altercations due to his left shoulder pain." *Id.* For pain management, Petitioner used an NSAID, a topical analgesic cream, capsaicin cream, and Tylenol. *Id.* The physical therapist concluded that PT was not needed at this time, but suggested that Petitioner restart stretching with a therapy band. *Id.* at 58.

---

before it was completed due to a fear of needles. Ex. 10 at 68, 149. Petitioner did not receive any steroid injections for his left shoulder.

[13] Petitioner also seems to have objected to being prescribed what he perceived as an anti-depressant for his pain, instead of a muscle relaxer. *See id.* at 135.

On July 17, 2023, Petitioner saw a nurse for "severe" left shoulder and neck pain. Ex. 11 at 31. The nurse noted that Petitioner "does not appear to be in extreme pain" and was actively moving his arms while speaking. *Id.* Petitioner also submitted an HSR form on August 6, 2023 complaining that the therapy stretch band was making his left shoulder bruised and fatigued. *Id.* at 294. Petitioner requested further pain management and again stated that he was experiencing constant 10/10 pain. *Id.*

Petitioner underwent the EMG on October 10, 2023, which revealed mild to moderate median nerve impingement at the carpal tunnel and mild impingement of the ulnar nerve at the elbow. *Id.* at 95. Petitioner was then seen by Dr. Gina DeGiovanni on October 16, 2023 to discuss the results. *Id.* at 52. Petitioner complained of lower back, neck, and left shoulder pain. *Id.* With regard to his left shoulder, Dr. DeGiovanni referred Petitioner back to orthopedics for "re-assessment of continued pain at AC joint and joint capsule, where ROM inhibited by pain." *Id.*

On January 26, 2024, Petitioner returned to Dr. Riley. *Id.* at 92. Dr. Riley diagnosed Petitioner as having adhesive capsulitis of the left shoulder, which was "stuck and not improving after much greater than a year," left carpal tunnel syndrome, and left cubital tunnel syndrome. *Id.* Petitioner indicated that he would like to proceed with an arthroscopic capsulotomy to "improve his flexion and reduce his pain," even though Dr. Riley warned that it would not "reliably improve his internal rotation." *Id.*

It took some time for Petitioner's surgery to be approved by the incarceration institution. *See id.* at 46, 253, 255, 265. Petitioner submitted several HSR forms requesting pain management, including a steroid injection, for his left shoulder. *See id.* at 253, 256, 264, 272, 273, 274. In April 2024, Petitioner was informed that a steroid injection would not be appropriate because his surgery would be scheduled soon. *See id.* at 241, 253. While waiting for his surgery, Petitioner participated in three PT sessions for left shoulder and back pain on March 19, April 5, and May 15, 2024.

On June 7, 2024, Petitioner underwent a left shoulder arthroscopic capsulotomy by Dr. Riley. Ex. 12 at 14. In his post-operative report, Dr. Riley noted that he performed "minimal debridement" in the subacromial space, but there was no sign of a rotator cuff tear or active inflammation. *Id.* Dr. Riley found that the glenohumeral joint "[r]eally looked pretty good except for mild injection of rotator interval tissue." *Id.* According to Dr. Riley, this tissue "looked more baggy or redundant than in other frozen shoulder cases." *Id.* Dr. Riley released the rotator interval and found that the tissue was "about one cm thick." *Id.* However, the "posterior capsule did not appear to be tight in any way and thus no posterior capsulotomy was done." *Id.*

Petitioner did not file any additional records.[14] In Petitioner's damages brief, it is contended that counsel had a conversation with Petitioner in "mid-July 2024," in which Petitioner represented that the surgery helped alleviate his pain, but that he had lost some ability to abduct his shoulder. Pet'r Br. at 15. Petitioner was also apparently attending weekly post-operative PT sessions and planned to request a cortisone injection from Dr. Riley. *Id.* Petitioner concluded, without citation to any medical evidence, that his condition is permanent and will likely affect him for the rest of his life. *See id.* at 15, 21.

## II. Damages

In another recent decision, I discussed at length the legal standard applicable to determinations of damages, as well as prior SIRVA compensation decisions within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Pello v. Sec'y of Health & Human Servs*., No. 24-1896, 2026 WL 2211341 (Fed. Cl. Spec. Mstr. July 14, 2026).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[15]

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However,

[14] Petitioner's affidavit is dated February 17, 2021, and largely repeats the allegations in the Petition. See Ex. 2 at 1-6. Petitioner did not provide any additional testimony about his later treatment or residual symptoms.

[15] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I base my determination on the circumstances of this case.

Petitioner seeks a pain and suffering award of $140,000.00 to $160,000.00. Pet'r Br. at 1, 19-21; Pet'r Reply at 1, 5. In support of the proposed award, Petitioner cites *Amor* ($130,000.00), *McKay* ($127,500.00),[16] *Blanco* ($135,000.00), and *Reed* ($160,000.00).[17] Petitioner argues that his injury and treatment were worse than in *Amor*, *McKay*, and *Blanco*, meriting a higher award, and slightly less severe than in *Reed*. Pet'r Br. at 20. But despite arguing that his injury is permanent and referencing his life expectancy, Petitioner does not actually request damages for future pain and suffering. *Id.* at 21.

Here, Petitioner required prescription medication, participated in 23 PT sessions, had an MRI, attended numerous nurse and doctor appointments, and ultimately underwent surgery. Although Petitioner's symptoms have persisted for an extended period of time, and he consistently reported high levels of pain, the comparable cases he references are not analogous. In all of them, the petitioners received more treatment, and this treatment was more proximally connected to the SIRVA injury. There is thus no basis for finding Petitioner's circumstances to be significantly more severe or even within the same range of severity.

The most notable differences from *Amor* and *McKay* are the greater number of cortisone injections and the more complex nature of the surgical procedures. In *Amor*, a petitioner received five cortisone injections over 18 months. When the *Amor* petitioner reported that her pain was getting worse after her final cortisone injection, she underwent arthroscopic surgery involving debridement, decompression, evacuation of calcium deposits, and partial distal claviculectomy. Similarly, the *McKay* petitioner received one cortisone injection and underwent a rotator cuff repair, subacromial decompression, and partial acromioplasty. Here, by contrast, despite showing some interest in this treatment, Petitioner did not receive a single cortisone injection. With regard to the surgery, other than minimal debridement and opening the rotator cuff interval, Dr. Riley characterized Petitioner's shoulder as "look[ing] pretty good," and did not see any need to perform a posterior capsulotomy. These facts are persuasive in favor of a lower award.

---

[16] Petitioner's brief incorrectly states that the McKay petitioner was awarded $135,000.00 for pain and suffering. *See* Pet'r Br. at 23.

[17] *Amor v. Sec'y of Health & Hum. Servs.*, No. 20-0978V, 2024 WL 1071877 (Fed. Cl. Spec. Mstr. Feb. 8, 2024); *McKay v. Sec'y of Health & Hum. Servs.*, No. 21-0071V, 2023 WL 9231565 (Fed. Cl. Spec. Mstr. Dec. 11, 2023); *Blanco v. Sec'y of Health & Hum. Servs.*, No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020); *Reed v. Sec'y of Health & Hum. Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019).

*Blanco* has further factual distinctions that make it even less of a useful comparator. The *Blanco* petitioner underwent "significant treatment" for over two years. She had between 23 to 44 PT sessions, massage therapy, four steroid injections, acupuncture, three MRIs, and an arthroscopic surgery. This surgery involved subacromial decompression, biceps tenotomy with glenohumeral debridement, and rotator cuff repair. This case evidenced a "fairly severe injury" requiring a "significant surgical procedure." On these less severe facts, I will not grant Petitioner's request for even more than the $135,000.00 awarded in *Blanco*.

Petitioner's circumstances are also less severe than in *Reed*. The *Reed* petitioner received a steroid injection and underwent an arthroscopic debridement of the bursa and acromioplasty. Further, whereas Petitioner has not provided any records substantiating the argument of counsel that his shoulder will require lifelong treatment, the *Reed* petitioner ended up using long-term opioid pain medication through a pain management doctor. The *Reed* petitioner described physical difficulty in caring her son and grandchildren and "significant disruptions of her ability to work, care for her family, and enjoy recreational activities." Petitioner has not provided this kind of testimony here.

In arguing that his circumstances warrant a somewhat higher award than in *Amor*, *McKay*, and *Blanco*, Petitioner focuses on the lengthy duration of his injury, his greater number of PT sessions, and the reportedly constant and severe nature of his pain. *See* Pet'r Br. at 20-21. However, Petitioner incorrectly minimizes his discharge from PT in April 2021 and the subsequent five-month gap in which he treated other areas of pain without any mention of his left shoulder. There is no basis in the record for Petitioner's argument that this gap was merely a "pause" to "deal with more pressing health issues." *See* Pet'r Reply at 2.

Petitioner also ignores the fact that his left shoulder pain seemingly reoccurred after sleeping without a mattress, as well as the confounding symptoms in his neck and wrist/elbow. Although I take into account Dr. Riley's assessment that Petitioner's condition would benefit from surgery, after April 8, 2021 (as I indicated in the Ruling on Entitlement), the "subsequent medical records are less clear as to whether Petitioner was still suffering from a SIRVA, versus more compensatory or entirely unrelated pain in other parts of his body which would be harder to include in the SIRVA damages picture." ECF No. 37 at 10. While Respondent's argument that this later treatment was not "significantly connected" to the initial SIRVA goes too far, *see* Resp't Br. at 16, this is not a case in which a simple four and half year duration accurately represents the nature of the injury.

Nonetheless, despite the inapplicability of Petitioner's cases, Respondent's selected cases are also not on point. Respondent recommends a far lower award of no more than $85,000.00, relying on *Hunt* and *Shelton*, which awarded $95,000.00 and

$97,500.00 respectively.[18] Resp't Br. at 20-21. Respondent's reliance on *Hunt* and *Shelton* is not persuasive. Indeed, several decisions have recognized that these cases are outliers.

Respondent attempts to address why *Hunt* and *Shelton* awarded relatively low amounts in pain and suffering, but those facts only underscore why they are poor comparisons. The *Hunt* petitioner had periods without any pain, and the *Shelton* petitioner had a long initial treatment gap. Petitioner's five-month treatment gap is dissimilar from the gap in *Hunt* of over a year. Respondent also inexplicably argues that a lesser award is appropriate here despite acknowledging that, unlike the *Shelton* petitioner, who waited five months to seek treatment, Petitioner sought treatment for his pain almost immediately after vaccination. *See id.*

I do not find Respondent's recommendation that Petitioner receive even less than in *Hunt* and *Shelton* to be commensurate with the level of pain and duration of treatment that Petitioner experienced. Respondent relies too much on arguments that Petitioner is not credible or that he exaggerated his complaints for litigation purposes.[19] *See id.* at 14-16, 20-21. Respondent's characterization that Petitioner's "subjective symptoms seemed to escalate as the litigation process continued" is not supported by the record. *See id.* at 19. Instead, from the beginning, Petitioner doggedly demanded medical attention and there was no specific uptick in complaints or treatment after February 2021.

Although it is true that some of Petitioner's treaters documented apparent inconsistencies between his complaints and his observed behavior, I also note that due to his incarceration, Petitioner waited long intervals between treatments and had some difficulties accessing interventions beyond a default conservative management through over-the-counter medications. Even accepting that some embellishment occurred, and giving less weight to the treatment after April 2021, this was still at least a moderate SIRVA that did not quickly resolve. Respondent's concerns alone do not justify an award far below the norm for this type of case.[20]

---

[18] *Hunt v. Sec'y of Health & Hum. Servs.*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022); *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021).

[19] This case is one of many currently pending brought by petitioners incarcerated by the State of Wisconsin. In those cases, Respondent has filed motions for a fact hearing and/or motions to reopen entitlement. However, Respondent did not file any objection to an award of damages on the briefs in this case.

[20] Respondent also argues that an award that "significantly deviates" from Respondent's damages assessment would "incentivize petitioners to reject [R]espondent's full-value proffers, confident that the court will always award more." Resp't Br. at 12. Respondent asserts that "petitioners are now routinely declining to accept [R]espondent's full value proffers," which creates more work for the court, Respondent, and "drives up attorney fees to be reimbursed by the Vaccine Program." *Id.* Respondent's concerns about

Given that neither party's comparator cases are particularly helpful, I look to my recent damages award of $133,000.00 in *Anderson*.[21] That case also involved a Wisconsin prisoner, as well as some of the same treaters. The *Anderson* petitioner similarly reported pain almost immediately after vaccination, submitted large numbers of HSR forms, and was given the same conservative treatment initially by the institution's nurses and doctors. However, unlike in the instant case, the *Anderson* petitioner received one steroid injection and a Toradol injection prior to surgery, and was also prescribed more frequent PT. He provided records evincing a lack of resolution in his symptoms after surgery and underwent a significant amount of treatment post-op, including additional PT and two more steroid injections. The surgery itself involved a subacromial decompression, distal clavicle excision, and limited debridement of the glenohumeral joint, including superior labrum, rotator cuff, and synovitis. In *Anderson*, the petitioner received an assessment that he might have to continue to "undergo occasional injections or consistent oral anti-inflammatories to help with the symptoms."[22] The overall duration of the injury was approximately three years.

*Anderson* counsels that Petitioner should receive a significantly lower award than what is demanded. Again, in taking into account the differences in treatment, its timing, and its complexity, Petitioner suffered a less severe injury, even if the duration was more extended. I recognize that this was a surgery case, but the less-certain connection between Petitioner's post-April 8, 2021 treatment and the vaccination, along with his unrelated areas of pain, also warrant a lower amount. Overall, given the circumstances of this case, I find it appropriate to award $100,000.00 for pain and suffering.[23]

## Conclusion

For the foregoing reasons and based on consideration of the entire record, **Petitioner is awarded a lump sum payment of $100,000.00 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement.**

---

the increased frequency of damages briefing and the court's workload are not factors to be considered in determining the value of a pain and suffering award.

[21] *Anderson v. Sec'y of Health & Hum. Servs.*, No. 23-1534V, 2025 WL 3459703 (Fed. Cl. Spec. Mstr. Oct. 27, 2025).

[22] Petitioner copies this language in the instant case to suggest that he has suffered a permanent injury. *See* Pet'r Br. at 16.

[23] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[24]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[24] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.